# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

UPPER HUDSON NATIONAL
INSURANCE COMPANY
4446 Route 42, Suite B
Monticello, NY  12701

          Plaintiff,

v.

WILLIAM R. MILLER, II
6917 Timber Creek Court
Clarksville, MD  21045

AMS SURETY HOLDINGS CORP., f/k/a FIRST
FLORIDA CAPTIVE HOLDINGS CORP.
8840 Stanford Boulevard, Suite 4000
Columbia, MD  21045

SERVE:
  The Corporation Trust, Inc.
  300 East Lombard Street
  Baltimore, MD  21202

AMS CAPITAL HOLDINGS CORP.
8840 Stanford Boulevard, Suite 4000
Columbia, MD  21045

SERVE:
  The Corporation Trust Company
  Corporate Trust Center
  1209 Orange Street
  Wilmington, DE  19801

ROBERT C. TARDIF
2 Ferrous Court
Hunt Valley, MD  21030

NADIA KAHLER
AMS Surety Holdings Corp.
8840 Stanford Boulevard, Suite 4000
Columbia, MD  21045



Case No. _____

MJG 08 CV 0 4 4 0

<u>TRIAL BY JURY DEMANDED</u>

DANIEL D. SULLIVAN
599 Lake Avenue
Manchester, NH  03103

BRYAN L. WAKEFIELD
AMS Surety Holdings Corp.
8840 Stanford Boulevard, Suite 4000
Columbia, MD  21045

and

TIMOTHY E. BARNHARDT
6115 Green Gables Court
Suwannee, GA  30024

                              Defendants.

## COMPLAINT

Plaintiff, Upper Hudson National Insurance Company, by and through its attorneys, complaining against Defendants, William R. Miller, II, AMS Surety Holdings Corp. (f/k/a First Florida Captive Holdings Corp.), AMS Capital Holdings Corp., Robert Tardif, Nadia Kahler, Daniel Sullivan, Bryan Wakefield, and Tim Barnhardt, alleges as follows:

### Nature of the Action

1.      Upper Hudson National Insurance Company brings this action against individuals and corporate entities that conspired to defraud Upper Hudson and others.  The purpose of the scheme to defraud was to cloak William R. Miller, II and AMS Surety Holdings Corp. with the legitimacy of Upper Hudson National Insurance Company, a licensed insurance company, thereby exploiting Upper Hudson National Insurance Company's goodwill and licenses.  Miller, through AMS Capital Holdings, Corp., entered into a stock purchase agreement for the acquisition of Upper Hudson National Insurance Company from Upper Hudson Holdings, LLC. The closing of the transaction contemplated by the stock purchase agreement anticipated that the New York State Insurance Department would approve the transfer of ownership of Upper

2

Hudson National Insurance Company from Upper Hudson Holdings, LLC to AMS Capital

Holdings Corp.  Because of his background, which included the revocation of an insurance

license by the State of Maryland, Miller knew (or did not care) that the transfer of ownership

would never be approved and that during the interim time period between execution of the stock

purchase agreement and the inevitable termination of that agreement, he, together with AMS

Surety Holdings Corp., would be able to exploit Upper Hudson National Insurance Company's

name, goodwill and licenses by issuing inappropriate, fraudulent and illegal surety bonds.

### Jurisdiction and Venue

2.      This Court has jurisdiction over the federal law claims asserted in this complaint

pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1965(a).  This Court also has jurisdiction over the

claims asserted in Counts III and IV of this complaint pursuant to 28 U.S.C. § 1332(a), as this

action is between citizens of different states and the amount in controversy exceeds $75,000,

exclusive of interest and costs.

3.      Venue is proper in the District Court of Maryland, Northern Division, pursuant to

28 U.S.C. § 1391 and 18 U.S.C. § 1965, because Defendants reside in, are found in, have an

agent in, and/or transact their affairs in Maryland, and Maryland is where a substantial part of the

events complained of occurred.

### Parties

4.      Upper Hudson National Insurance Company ("Upper Hudson") is a New York

corporation with its principal place of business located in Monticello, New York.  Upper Hudson

is a wholly-owned subsidiary of Upper Hudson Holdings, LLC ("Upper Hudson Holdings"), a

New York limited liability company.

3

5.     AMS Surety Holdings Corporation, formerly known as First Florida Captive Holdings Corp. ("AMS Surety"), is a Delaware corporation with its principal place of business located in Columbia, Maryland.

6.     AMS Capital Holdings Corp. ("AMS Capital") is a Delaware corporation with its principal place of business located in Columbia, Maryland.

7.     William R. Miller II, also known as Ray Miller or Raymond Miller ("Miller"), is a citizen of the State of Maryland.  Miller is the sole shareholder and Chief Executive Officer of AMS Surety.  Miller is the sole shareholder of AMS Capital.

8.     Robert Tardif ("Tardif") is a citizen of Maryland.  At all relevant times relating to the allegations of this Complaint, Tardif has been the President of AMS Surety.

9.     Nadia Kahler ("Kahler") is a citizen of Maryland.  At all relevant times relating to the allegations of this Complaint, Kahler has been the executive assistant to Miller and employed by AMS Surety as an underwriting assistant.

10.    Daniel Sullivan ("Sullivan") is a citizen of New Hampshire.  Beginning in May of 2007, Sullivan acted as an outside financial consultant for AMS Surety, assisted in the preparation of AMS Surety's financial statements and is therefore knowledgeable regarding AMS Surety's accounting and bookkeeping practices and procedures.

11.    Bryan Wakefield ("Wakefield") is a citizen of Maryland.  Beginning in July of 2007, Wakefield became the Director of Finance for AMS Surety, assisted in the preparation of AMS Surety's financial statements and is therefore knowledgeable regarding AMS Surety's accounting and bookkeeping practices and procedures.

12.     Tim Barnhardt ("Barnhardt") is a citizen of Georgia.   Beginning in 2005, Barnhardt acted as an insurance broker for AMS Surety.   Barnhardt, through his firm M&M Surety, Inc. ("M&M"), markets and sells surety bonds on behalf of AMS Surety.

### The Enterprise

13.     Miller, Tardif, Kahler, Sullivan, Wakefield and Barnhardt were employed by and associated with an enterprise, hereinafter referred to as the "AMS Enterprise," consisting of AMS Surety, AMS Capital and M&M.   These inter-related entities were owned, operated and controlled, in whole or in part, directly by Miller and Barnhardt.   The AMS Enterprise constituted an enterprise, as that term is defined in 18 U.S.C. § 1961(4), namely, a group of legal entities associated in fact.   The AMS Enterprise constituted an organization whose members, associates, employees and agents functioned as a continuing unit for a common purpose of achieving the objectives of the AMS Enterprise.   The AMS Enterprise was engaged in interstate commerce, and the activities of the AMS Enterprise affected interstate commerce.

14.     The AMS Enterprise operates AMS Surety as an illegal and unlicensed insurance company that during the calendar year of 2006 underwrote and issued over 200 surety bonds with an aggregate penal bond amount of over $275 million in various states, including but not limited to Georgia, Florida, North and South Carolina, New Jersey, Pennsylvania, Louisiana and Alabama.

### The Scheme

15.     Since AMS Surety was not a licensed or "admitted" insurance company, Miller sought to enter into a relationship with one or more properly licensed and "admitted" insurance companies, such as Upper Hudson, to trade under its banner and to exploit its goodwill, name and licenses so as to increase the number of customers and clients to which AMS Surety could market and issue improper and/or fraudulent surety bonds.

5

16.     As alleged in greater detail below, Miller, through AMS Capital, entered into a stock purchase transaction with Upper Hudson Holdings, whereby it was contemplated that AMS Capital would obtain all of the issued and outstanding stock of Upper Hudson contingent upon the occurrence of certain events within one year of entering into the stock purchase agreement. One such contingency was obtaining the approval of the New York State Insurance Department of the transfer of ownership of Upper Hudson from Upper Hudson Holdings to AMS Capital.

17.     Given Miller's previous adjudicated fraud and revocation of his insurance license in Maryland, Miller well knew that the New York State Insurance Department would never approve such a transfer, nor was obtaining such approval essential to his scheme. Miller knew that at least until such time that the New York State Insurance Department rejected the transfer of ownership, which he believed would take up to one year, Miller, AMS Surety and the AMS Enterprise would have the opportunity to exploit and use Upper Hudson, its name and goodwill to issue improper and/or fraudulent surety bonds through AMS Surety.

18.     Specifically, Miller and/or AMS Surety exploited Upper Hudson as follows: (1) issued bonds in excess of Upper Hudson's statutory limit without informing Upper Hudson; (2) issued improper bonds with AMS Surety (an unlicensed entity) and Upper Hudson as co-sureties without informing Upper Hudson; and (3) issued fraudulent and/or unauthorized bonds under the guise of Upper Hudson and other established insurance companies (*e.g.*, Endurance Reinsurance Corporation of America) without the knowledge of Upper Hudson and such other companies. In addition to the exploitation of Upper Hudson, other victims of the scheme to defraud included the unsuspecting purchasers of improper, fraudulent and/or illegal surety bonds issued by Miller through Upper Hudson or in the name of Endurance Reinsurance Corporation of

6

America and the obligees of such bonds, which included public entities, including but not limited to the United States of America.

19.    To carry out the scheme, Miller engaged and used the assistance of AMS Surety's insurance brokers (including Barnhardt), Miller's personal assistant and AMS Surety's Assistant Underwriter (Kahler), AMS Surety's President (Tardif), AMS Surety's Director of Finance (Wakefield), and AMS Surety's outside financial consultant (Sullivan).   In furtherance of the scheme, AMS Surety, through its employees, sent to Upper Hudson by commercial interstate carrier and electronic mail bond documentation, checks representing payment of bond premiums and bond files to lull Upper Hudson and its officers and agents into a false sense of security that Miller and AMS Surety were conducting themselves in accordance with the terms and conditions of the Stock Purchase Agreement (as hereinafter defined), the Employment Agreement (as hereinafter defined) and their interim understanding regarding bond underwriting, and that they were honoring the terms of those agreements.   The assistance of each of the individual defendants was necessary for Miller and AMS Surety to carry out the scheme.

### Factual Background

***Negotiations for the Sale of Upper Hudson***

20.    In January, 2006, Upper Hudson, then known as Marine Indemnity Insurance Company of America, was acquired by Upper Hudson Holdings for approximately $10 million. Subsequent to its acquisition of Upper Hudson, Upper Hudson Holdings invested in Upper Hudson approximately $600,000 in additional working capital.   At the time of Upper Hudson Holdings' acquisition of Upper Hudson, Upper Hudson was licensed to sell and/or produce insurance policies in 17 states, including New York.

21.    In February, 2007, Upper Hudson Holdings began to explore the potential sale of Upper Hudson.

7

22.     On or about March 20, 2007, following several telephone conversations with Robert Wong ("Wong"), the Secretary of Upper Hudson, discussing the potential sale of Upper Hudson, Miller flew to Monticello, New York, for a dinner meeting with senior members of Upper Hudson.  These senior members included Robert Berman ("Berman") (Executive Vice-President of Upper Hudson), Scott Kaniewski ("Kaniewski") (President of Upper Hudson) and Wong.

23.     During the March 20, 2007, dinner meeting, the parties discussed the potential acquisition of Upper Hudson by Miller or by an entity controlled by him.  Miller informed Berman, Kaniewski and Wong of the nature of AMS Surety's business.  Specifically, Miller stated that he was interested in acquiring an "admitted" company to write surety bonds for his and/or AMS Surety's existing and/or potential customers and those of certain insurance brokers with whom he worked – that is, he sought to acquire a licensed insurance company which was authorized by state departments of insurance to issue insurance policies in a number of states. Additionally, Miller represented to Berman, Kaniewski and Wong that: (1) he was the sole shareholder and CEO of AMS Surety; (2) AMS Surety was able to charge higher premiums and pay lower brokerage commissions for surety bonds issued by AMS Surety because it served the middle market; (3) Goldman Sachs, a global investment firm, and Oracle, a publicly-owned software firm, provided financial backing to AMS Surety; (4) AMS Surety collected approximately $9-10 million in premiums annually through only three or four brokers; (5) AMS Surety experienced less than a 10% loss ratio on the surety bonds it issued; (6) AMS Surety was revolutionizing the surety-bond industry and it could issue surety bonds without a license because it was exempt under the federal Miller Act; and (7) Johnson Lambert & Co., a public accounting firm, audited the financial statements of AMS Surety, and Milliman, Inc. acted as

8

AMS Surety's actuarial consultants. Miller also stated that he recently finalized an agreement to acquire Martingale National Insurance Company ("Martingale"), an admitted carrier licensed in six states and the District of Columbia, and he provided financial projections for AMS Surety on a consolidated basis based on its acquisition of Martingale. These financial projections showed annual gross written premiums of over $360 million and net income in excess of $61 million over a five-year period.

24.     On or about March 29, 2007, Wong traveled to AMS Surety's offices in Columbia, Maryland, for further meetings regarding a potential stock purchase transaction for the sale of Upper Hudson. On that date, Wong met with Miller, Tardif and Kahler and discussed with them the nature of AMS Surety's business. During these meetings, Miller represented that AMS Surety had been issuing surety bonds since 2005, and that AMS Surety had $30 million in financial backing pledged by Goldman Sachs and Oracle. Additionally, Miller reiterated to Wong that AMS Surety was interested in entering into a business relationship with an "admitted" insurance company such as Upper Hudson. Tardif presented his background in the insurance industry, including his former position as a regulator with the Maryland Insurance Administration, and stated that AMS Surety operates as a private surety company under the federal Miller Act, which pre-empts state law, and therefore was exempt from state insurance regulations. During this visit, Wong also reviewed certain underwriting files selected by Miller for Wong's review and financial projections for AMS Surety, also provided by Miller, reflecting the operations of a combined entity in the event that AMS Surety should enter into a relationship with an admitted insurance company such as Upper Hudson. To demonstrate the financial success which Miller claimed AMS Surety was then achieving, Miller showed Wong premium checks written to AMS Surety for surety bonds issued by AMS Surety.

9

25.     On or about April 9, 2007, Berman, Kaniewski and Wong traveled to Columbia, Maryland, to meet with Miller to further discuss the potential sale of Upper Hudson and to view AMS Surety's offices and operations.  On or about April 9 and April 10, 2007, Wong, Berman, Kaniewski and Miller discussed how a stock purchase agreement relating to the sale of Upper Hudson might be structured.  Miller represented to Berman and Kaniewski that he had a net worth of over $15 million.  Additionally, Miller repeated to Berman, Kaniewski and Wong the same information that he had provided during the March 20, 2007 dinner meeting.  On the evening of April 9, 2007, Berman, Kaniewski, Wong, Miller and Tardif had a dinner meeting to further discuss AMS Surety and the acquisition of Upper Hudson.  Prior to the dinner meeting, Tardif represented to Berman that AMS Surety was a legitimate and legal company and that AMS Surety, because of AMS Surety's exemption under the Miller Act, had an advantage over AMS Surety's competition.  During the dinner meeting, Tardif and Miller reiterated to Berman, Kaniewski and Wong that AMS Surety operated a legitimate and legal business and that AMS Surety had an advantage over the competition.  Miller also suggested to Berman that Berman visit with Tim Barnhardt, AMS Surety's primary broker and major producer of surety bond business, to further discuss AMS Surety's business.  Upon the conclusion of these meetings, Wong, Berman, Kaniewski and Miller agreed to continue to discuss a written term sheet regarding a potential stock purchase agreement.

26.     From on or about April 11, 2007, through April 23, 2007, Wong, Berman, Kaniewski and Miller discussed and negotiated a series of draft term sheets, by telephone and e-mail correspondence.

27.     Beginning in late April, 2007, lawyers for AMS Capital and Upper Hudson Holdings continued to negotiate the terms of the stock purchase transaction and began preparing

preliminary drafts of transactional documents.  On May 29 and May 30, 2007, Miller, on behalf of AMS Capital, together with AMS Capital's lawyers, met with Berman, Kaniewski and Wong, on behalf of Upper Hudson and Upper Hudson Holdings, and their lawyers, in New York City, to continue to negotiate the stock purchase agreement for the sale of Upper Hudson.  During these meetings, Miller represented to Berman, Kaniewski and Wong that he was proceeding toward a closing on the acquisition of Martingale (another "admitted" company).  Additionally, Miller represented that AMS Surety's audited financial statements for 2006 would be provided upon completion of the audit by Johnson Lambert & Co.  At the end of these two days of meetings, AMS Capital and Upper Hudson Holdings had not yet finalized the stock purchase agreement but agreed to continue to work toward a final agreement.

28.     From on or about May 31, 2007, through June 10, 2007, AMS Capital and Upper Hudson Holdings, and their respective counsel, continued to draft and revise documents relating to the stock purchase agreement.  Additionally, in connection with the anticipated transaction, Berman, Kaniewski and Wong continued to request from Miller AMS Surety's 2006 audited financial statements.  In response, Miller advised that the 2006 audit had not been completed but promised that AMS Surety's 2006 audited financial statements would be provided upon completion of the audit by AMS Surety's auditors, Johnson Lambert & Co.

*Stock Purchase Agreement*

29.     On June 11 and 12, 2007, further meetings between AMS Capital and Upper Hudson Holdings took place in New York City.  At these meetings, AMS Capital was represented by Miller and AMS Capital's lawyers and Upper Hudson Holdings was represented by Berman, Kaniewski and Wong and Upper Hudson Holding's lawyers.  During these meetings, Berman, Kaniewski and Wong again requested from Miller copies of AMS Surety's 2006 audited financial statements.  In response, Miller again represented to Berman, Kaniewski and

Wong that Johnson Lambert & Co. had not yet completed the audit of AMS Surety's financial statements, because Johnson Lambert & Co. had changed its audit team.  Berman, Kaniewski and Wong also asked Miller about the pending transaction with Martingale.  In response, Miller represented that everything was on track, that the acquisition of Martingale would allow AMS Surety to write insurance policies in states which would supplement those states in which Upper Hudson already was licensed, and that the deal would close at the end of June, 2007.  Upper Hudson Holdings and AMS Capital executed the stock purchase agreement for the sale of Upper Hudson on June 12, 2007 ("Stock Purchase Agreement").

30.     Pursuant to the Stock Purchase Agreement, Upper Hudson Holdings agreed to sell to AMS Capital 9,400 shares of Upper Hudson (representing 100% of Upper Hudson's issued and outstanding capital stock) in exchange for 8,500 shares of preferred stock (valued at $8,500,000) in AMS Capital plus a cash payment of $2,750,000.

31.     The Stock Purchase Agreement further provides that the closing of the Stock Purchase Agreement would take place only "after all of the conditions contained in Articles VI and VII [of the Stock Purchase Agreement] have been satisfied or waived."

32.     Section 7.8 of the Stock Purchase Agreement, found in Article VII, provides that as a condition of the sale contemplated by that Agreement "[t]he parties hereto shall have received all approvals from any applicable Governmental Authority necessary to consummate the transactions contemplated hereby," and Schedules 2.8 and 3.4 of the Stock Purchase Agreement expressly provide that "[a]pproval of the New York State Department of Insurance is required for the consummation of the transactions contemplated by this [Stock Purchase] Agreement."  As a consequence of the foregoing terms, the New York State Insurance Department had to approve the transfer of control of Upper Hudson in order "to consummate the

12

transaction contemplated" by the Stock Purchase Agreement by June 30, 2008, or either Buyer or

Seller had the right to terminate the Stock Purchase Agreement pursuant to Section 9.1(d).

Absent such approval by the New York State Insurance Department, neither AMS Capital, AMS

Surety nor Miller would be authorized to operate or control Upper Hudson.

33.     In connection with the Stock Purchase Agreement, on June 12, 2007, Miller and

Upper Hudson entered into an employment agreement ("Employment Agreement") whereby

Upper Hudson agreed to employ Miller as its Chief Underwriting Officer subject to the terms

and conditions of the Employment Agreement.   The Employment Agreement provides that

"[Miller's] Term [of employment] shall terminate upon the first to occur of (i) the closing of the

acquisition of [Upper Hudson] by [AMS Capital], (ii) the termination of the [Stock] Purchase

Agreement, (iii) [Miller's] resignation, (iv) [Miller's] death or Permanent Disability ..., or

(v) the termination of [Miller's] employment by [Upper Hudson] at any time for Cause." It was

further agreed that Miller would utilize AMS Surety in carrying out Miller's interim

responsibilities as Upper Hudson's Chief Underwriting Officer – that is, pending the closing of

the transaction. Paragraph 2 of the Employment Agreement provides:

> [Miller] shall report to [Upper Hudson's] Chief Executive Officer (or his
> designee) and shall oversee the underwriting of surety bonds (any such surety
> bonds underwritten at the direction of the Employee during the Term being
> referred to herein as the "Miller Surety Bonds") on behalf of [Upper Hudson] and
> perform such other related duties as the Company's Chief Executive Officer may
> reasonably assign him from time to time.   In such capacity, subject to
> countersignature by a corporate officer of [Upper Hudson], [Miller] may write
> any surety bond without further [Upper Hudson] approval, provided that any
> surety bond exceeding $1 million in coverage shall be subject to review by Robert
> Berman (or, if Mr. Berman is no longer employed by [Upper Hudson], by another
> officer of [Upper Hudson]) prior to issuance, and provided further that the
> premiums from all such bonds written during the Term do not exceed $5,000,000
> in the aggregate.

34.     Additionally, Article III of the Stock Purchase Agreement contains the

"Representations and Warranties of [AMS Capital]."   In Article III of the Stock Purchase

Agreement, AMS Capital represented and warranted that: (1) "Each Purchase Company has full corporate power and authority to conduct all of the business and activities conducted by it, …; and is duly licensed, registered or qualified to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of the business and activities conducted by it, and/or the character or the character of the assets owned or leased by it, makes such qualification or license necessary"; and (2) "Each Purchaser Company owns, holds or possesses all material Governmental Permits which are necessary … to carry on its business as currently conducted." The Stock Purchase Agreement defines "Purchaser Companies" as "[AMS Capital], AMS [Surety] and each of their respective wholly owned subsidiaries." The Stock Purchase Agreement defines "Governmental Permits" as "all licenses, franchises, registrations, permits, privileges, immunities, approvals and other authorizations from a Governmental Agency."

35.     As a condition to entering the Stock Purchase Agreement, Miller required that he be allowed to underwrite bonds for Upper Hudson during the interim period between execution of the Stock Purchase Agreement and procurement of the requisite governmental approval – that is, approval of the transfer of control of Upper Hudson by the New York State Insurance Department. Berman, Kaniewski, Wong and Miller discussed an interim protocol regarding the issuance of surety bonds by Upper Hudson pending the closing of the transaction. It was agreed that until the New York State Insurance Department approved the change of control of Upper Hudson and the transaction closed, Miller, pursuant to the Employment Agreement and as Upper Hudson's Chief Underwriting Officer, and/or AMS Surety would underwrite surety bonds to be issued by Upper Hudson. It was agreed that when the underwriting on a prospective surety bond was completed by Miller and/or AMS Surety in Maryland, Miller and/or AMS Surety would forward the underwriting file to Upper Hudson's offices in Monticello, New York. Once Upper

14

Hudson received the completed underwriting file, the parties understood and agreed that Upper Hudson would execute and issue the surety bond in New York and Upper Hudson would maintain the bond files in New York.

36.     Pursuant to a duly convened Board of Director's telephonic meeting of Upper Hudson on June 25, 2007, Miller's Employment Agreement as Chief Underwriting Officer of Upper Hudson was ratified and affirmed.

***Post-Stock Purchase Agreement***

37.     On or about July 16, 2007, Berman traveled to Atlanta, Georgia to meet with Barnhardt and Miller and to observe construction projects operated by GWL Services, a company on whose behalf AMS Surety issued surety bonds in connection with a federally-funded housing project. On that date, Berman had an opportunity to speak with Barnhardt, in Miller's absence, regarding, *inter alia*, AMS Surety and its operations. During this discussion, Barnhardt represented to Berman that: (1) AMS Surety's operations in Georgia were legitimate and legal; (2) AMS Surety had the approval of the State of Georgia; and (3) to date, Barnhardt assisted AMS Surety in selling millions of dollars of surety bonds in the southeast. Barnhardt also stated that he was excited about AMS Surety's and Miller's relationship with Upper Hudson because he was aware of a number of opportunities wherein the obligees of potential surety bonds desired an "admitted" carrier – such as Upper Hudson – to issue such bonds and that the new relationship would immediately yield millions of dollars in premiums for Upper Hudson and AMS Surety. Barnhardt encouraged Berman to continue to work with Miller because such a relationship would be mutually beneficial to Upper Hudson and AMS Surety. Finally, Barnhardt represented to Berman that Miller was an outstanding individual and that the Maryland Insurance Administration had levied too harsh a penalty on Miller by revoking his insurance license.

15

38.     On or about July 19, 2007, Miller and Kaniewski had a telephone conversation to discuss, *inter alia*, AMS Surety's 2006 audited financial statements.  During this telephone conversation, Miller informed Kaniewski that Johnson Lambert & Co. was not going to complete the audit and would not issue an opinion letter.  When Kaniewski asked Miller why Johnson Lambert & Co. would not complete the audit of AMS Surety's financial statements, Miller responded that Johnson Lambert & Co. was "incompetent," that it was poorly staffed, that it changed its audit team, and that Johnson Lambert & Co. had expressed concerns with the legality of AMS Surety's operations under the federal Miller Act.  During this telephone conversation, Miller stated that Johnson Lambert & Co.'s position regarding AMS Surety was baseless, that Miller's attorneys had previously confirmed that AMS Surety was operating legally and that Miller's attorneys provided the appropriate documentation, purportedly establishing the legality of AMS Surety's operations, to Johnson Lambert & Co.

39.     Subsequently, between July 23, 2007, and July 27, 2007, Kaniewski had telephone conversations with Sullivan (AMS Surety's outside chief financial officer) and Wakefield (AMS Surety's director of finance) regarding Johnson Lambert & Co.'s refusal to complete the audit of AMS Surety's 2006 financial statements and its withdrawal from that engagement.  During these discussions, both Sullivan and Wakefield acknowledged they were aware of Johnson Lambert & Co.'s concerns regarding the legality of AMS Surety and the reasons for Johnson Lambert & Co.'s withdrawal from the audit engagement.  Sullivan asserted that Johnson Lambert & Co.'s conclusion regarding the illegality of AMS Surety's operations was baseless and that AMS Surety's operations conformed with the Miller Act, and that Johnson Lambert & Co.'s withdrawal was the result of personality differences between Miller and Johnson Lambert & Co.'s audit team.  Wakefield also stated that the operations of AMS Surety

16

were legitimate and that Johnson Lambert & Co.'s concerns were unfounded. As AMS Surety's outside financial consultant and director of finance, respectively, Sullivan and Wakefield were responsible for AMS Surety's financial reporting, check writing, bank reconciliations and payroll. Additionally, from time to time, Upper Hudson would request from Sullivan and/or Wakefield certain financial information regarding AMS Surety. In response to such requests, Sullivan and/or Wakefield purposely delayed in providing the requested information to Upper Hudson, and in some instances never provided the requested information at all.

40.     In August, 2007, Kaniewski received from AMS Surety a power of attorney regarding a surety bond for Helmark Steel ("Helmark Bond"), a construction company located in Pennsylvania, relating to a hospital construction project in Philadelphia, Pennsylvania. The amount of the Helmark Bond ($21,251,757) exceeded Upper Hudson's statutory limit of approximately $750,000 for a surety bond that it was authorized to issue. Upon receipt of the power of attorney, Kaniewski telephoned Miller to discuss the Helmark Bond and the fact that it exceeded Upper Hudson's statutory limit. During this conversation, Miller advised Kaniewski that Pennsylvania law permitted Upper Hudson to issue the Helmark Bond, any statutory limit notwithstanding, and that he was exploring facultative reinsurance to lower Upper Hudson's risk exposure on the bond. Kaniewski informed Miller that he had to discuss this bond with and obtain the approval of Berman, since it exceeded $1 million, and that Miller should prepare a "white paper" for submission to the New York State Insurance Department to explain the propriety of the bond and obtain their approval. Miller then contacted Berman and reiterated that he was working on obtaining facultative reinsurance and that this bond may not get issued anyway. Berman asked if facultative reinsurance would be obtained through Endurance, and Miller responded that it was going to be provided through another reinsurer. Both Kaniewski and

17

Berman instructed Miller during their respective telephone conversations that the bond should not be issued unless the approval of the New York State Insurance Department or facultative reinsurance was first obtained. Miller asked that Kaniewski execute the power of attorney regarding the Helmark Bond, which Kaniewski did based upon Miller's assurances regarding applicable Pennsylvania law and that he would first obtain facultative reinsurance or the approval of the New York State Insurance Department before issuance of the bond. Kaniewski was on vacation at the time and Miller stated that he was concerned about being able to obtain the executed power of attorney from Kaniewski while Kaniewski was on his vacation and that Miller wanted to be prepared with the documentation in the event the bond did get issued during Kaniewski's absence from his office.

41.     On or about September 18, 2007, AMS Surety sent to Upper Hudson a check for payment for premium on the Helmark Bond. Contrary to Miller's prior conversations with Berman and Kaniewski, and without informing the officers of Upper Hudson, Miller and AMS Surety caused the Helmark Bond to be issued despite not having obtained facultative reinsurance or approval of the New York State Insurance Department. In addition, Miller issued the Helmark Bond in co-surety between Upper Hudson and AMS Surety, violating New York insurance regulations and his prior assurances to Upper Hudson. Miller and Kahler caused the client (and principal on the bond) to pay the total premium to AMS Surety based on an invoice issued by AMS Surety. On or about September 19, 2007, Miller, Kahler and Sullivan instructed Donald Appel, Upper Hudson's chief financial officer, to deposit the check issued by AMS Surety to Upper Hudson. Miller explained to Appel that Berman and Kaniewski had approved the bond and that he was working on obtaining reinsurance for the bond. Kahler sent to Appel via electronic mail a bond routing sheet from which an invoice was to be created for AMS

18

Surety's accounting records. No other bond underwriting files were provided to Upper Hudson relating to the Helmark Bond. Sullivan instructed Appel regarding the manner in which the accounting entries related to this bond should be recorded. Based on these instructions, Appel sent to Kahler an internal invoice for AMS Surety's records.

42.     In September, 2007, Miller, on behalf of AMS Capital, submitted to the New York State Insurance Department a completed Application for Approval for Acquisition of Control ("Form A") relating to the change of control arising from the proposed acquisition of Upper Hudson by AMS Capital.

43.     Commencing in September, 2007, and continuing through mid-January, 2007, it became increasingly difficult for Upper Hudson to track the activities of Miller, as Upper Hudson's Chief Underwriting Officer, and the surety bonds being issued by Upper Hudson through Miller, despite the protocol agreement and the provisions of the Employment Agreement. Additionally, Miller and AMS Surety were not consistently following the protocol agreed to in June, 2007, or the Employment Agreement, regarding the arrangement whereby Miller and AMS Surety would perform the underwriting functions and Upper Hudson would execute and issue bonds and their related powers of attorney. Specifically, AMS Surety and/or Miller were not forwarding in a timely manner the underwriting files to Upper Hudson's offices in Monticello, New York, prior to the issuance of surety bonds; rather, without the consent or authority of Upper Hudson, Miller and AMS Surety were issuing or causing such bonds to be issued, which Miller executed as Upper Hudson's "Chief Underwriting Officer." Miller also was not reviewing with Berman or any other officer of Upper Hudson surety bonds over $1 million prior to their issuance, as required by the Employment Agreement.

44.    On November 26, 2007, the New York State Insurance Department contacted Kaniewski and requested an emergency meeting with Upper Hudson to discuss Upper Hudson and Miller.  On November 27, 2007, Kaniewski met in New York City with representatives of the New York State Insurance Department to discuss Upper Hudson.  During this meeting, representatives of the department discussed Miller's background in Maryland, the revocation of his insurance license by the Maryland Insurance Administration, and his activities as the Chief Underwriting Officer of Upper Hudson.  Kaniewski was informed that the New York State Insurance Department would deny the Form A submitted by Miller, seeking the department's consent to the change of control of Upper Hudson.  Kaniewski was also informed during this meeting that if Upper Hudson did not remove Miller as its Chief Underwriting Officer, the New York State Insurance Department intended to commence an administrative action against Upper Hudson to have Miller removed as Chief Underwriting Officer.  Finally, Kaniewski was informed that even if Miller's Maryland insurance license were reinstated (an unlikely proposition), the New York State Insurance Department still would not approve the Form A because of Miller's personal bankruptcy issues, his invocation in certain legal proceedings of his Fifth Amendment privilege to remain silent, a judgment for constructive fraud entered against Miller in a fully adjudicated case, and the illegality of AMS Surety's operations.

45.    Also discussed during the November 27, 2007 meeting was the Helmark Bond issued by Upper Hudson and underwritten by Miller.  At this meeting, the New York State Insurance Department informed Kaniewski that the Helmark Bond was issued by Upper Hudson in co-surety with AMS Surety, and that it was illegal for an admitted carrier, such as Upper Hudson, to issue a surety bond with an unlicensed insurance company, such as AMS Surety.  Additionally, the New York State Insurance Department informed Kaniewski that there was no

justification, as advanced by Miller, for issuing the Helmark Bond in excess of Upper Hudson's statutory limits.  Prior to being so informed at this meeting, Upper Hudson was not aware that the Helmark Bond was issued by Upper Hudson and AMS Surety as co-sureties.

46.   Immediately following his meeting with the New York State Insurance Department, Kaniewski traveled to Columbia, Maryland, to meet with Miller, Tardif, Sullivan and other AMS Surety staff members. Kaniewski reported to these individuals that, according to the New York State Insurance Department, AMS Surety was an illegal operation. Kaniewski requested that AMS Surety provide an immediate accounting so that Upper Hudson could identify and review any other bonds issued by Upper Hudson in co-surety with AMS Surety, in addition to the Helmark Bond, and determine whether Upper Hudson, through Miller, had issued any additional surety bonds which exceeded Upper Hudson's statutory limit.

47.   On November 29, 2007, at the direction of Upper Hudson, Miller tendered his resignation as Upper Hudson's Chief Underwriting Officer and that resignation was accepted by Upper Hudson.   Additionally, Miller and AMS Capital withdrew the Form A previously submitted to the New York State Insurance Department.

48.   AMS Surety and its employees delayed the production of the information requested by Kaniewski relating to bonds issued by Upper Hudson and underwritten by Miller and/or AMS Surety. Finally, on December 5, 2007, in response to Upper Hudson's continuing requests, AMS Surety delivered to Upper Hudson a list purporting to be a list of all bonds issued by Upper Hudson which were underwritten by Miller and/or AMS Surety. Based upon a review of this list, Upper Hudson discovered, in addition to the Helmark Bond, two additional surety bonds issued to CPD Plastering, Inc., on which Upper Hudson and AMS Surety acted as co-sureties, and three other surety bonds that exceeded Upper Hudson's statutory limit (surety bonds

21

issued to Shared Systems, Inc., Kesco Dynamics and GMAC Construction).  Miller caused these additional bonds to be issued on behalf of Upper Hudson in violation of applicable New York State insurance regulations and in violation of the terms of the Employment Agreement.

49.     Upon discovering the existence of the three bonds that exceeded Upper Hudson's statutory limit, Upper Hudson immediately pursued and obtained special reinsurance from Endurance Reinsurance Corporation of America to cover these bonds.

50.     On December 11, 2007, a second meeting between Upper Hudson and the New York State Insurance Department took place in New York City.  During this meeting, the New York State Insurance Department reiterated to Upper Hudson that the Form A submitted by Miller, on behalf of AMS Capital, would have been denied had Miller and AMS Capital not withdrawn it.

51.     In or about early January, 2008, Miller advised Berman, Kaniewski and Wong that the review of his licensure by the Maryland Insurance Administration was proceeding favorably and that a settlement which would result in favor of reinstatement of his Maryland insurance license should be reached in the near future.

52.     On January 25, 2008, during a telephonic conference call among Berman, Kaniewski and Miller, Miller admitted to Berman and Kaniewski that AMS Surety was, in fact, an illegal operation, that AMS Surety had improperly issued surety bonds and that Miller intended to shut down AMS Surety's operations.  Additionally, on or about January 30, 2008, Barnhardt spoke with Berman and told him that Miller was trying to legitimize the operations of AMS Surety.

*The Fraudulent Endurance Bond*

53.     In September, 2007, Upper Hudson commenced discussions with Endurance Reinsurance Corporation of America ("Endurance") concerning the possibility of Endurance

providing reinsurance coverage to Upper Hudson for Upper Hudson's issued surety bonds.  On November 1, 2007, Endurance issued a placement slip confirming its reinsurance coverage for Upper Hudson.

54.     Prior to the issuance of Endurance's placement slip, on or about October 16, 2007, without the knowledge, consent or authority of Endurance, Upper Hudson or any of their respective officers or agents, Miller caused to be issued a fraudulent surety bond in the amount of $38,513,464 to the Iowa Tribe of Oklahoma, d/b/a BJK Solutions, Inc., in the name of Endurance Reinsurance Corporation of America (the "Endurance Bond").  The Endurance Bond also provided that the surety bond was "Administered Through: Upper Hudson National Insurance Co."  The obligee on this bond was the United States of America.

55.     In connection with the issuance of the Endurance Bond, while Miller had no authority to act on behalf of Endurance, Miller signed the bond as "Attorney in Fact" for Endurance, Miller prepared a fraudulent "Power of Attorney" purporting to appoint Miller as attorney-in-fact for Endurance to execute the bond on behalf of Endurance, and Miller prepared a fraudulent notarial jurat of the power of attorney.

56.     On or about January 29, 2008, a subcontractor on the construction project relating to the Endurance Bond contacted Endurance regarding the bond.  As a result, on January 29, 2008, Endurance contacted Upper Hudson to notify it of the issuance of the Endurance Bond and to discuss how and why it was issued.  Thereafter, Miller contacted Endurance and stated that (1) he had executed the Endurance Bond; (2) he had spoken with the U.S. Army Corps of Engineers on behalf of the obligee, who informed him that they would not accept a bond from AMS Surety; and (3) he had discussed Upper Hudson with the obligee and Upper Hudson's

23

relationship with Endurance. Endurance demanded that Miller provide it with all files and correspondence related to the fraudulent Endurance Bond, to which Miller has not yet responded.

57.     Later that same day, Miller contacted Berman to inform him of his conversation with Endurance and to advise him of the existence of the Endurance Bond. During this conversation, Miller admitted to Berman that the Endurance Bond was fraudulent – that is, he had created and executed the bond and power of attorney without any authority to do so – and that he (or AMS Surety) had collected premium in the amount of approximately $1.9 million in connection with his issuance of that bond.

***The Scheme***

58.     Miller, through AMS Capital, entered into the Stock Purchase Agreement with Upper Hudson Holdings knowing that the sale contemplated by that agreement would not be consummated, and without any concern that it would be, for the purpose of allowing AMS Surety to issue improper, fraudulent and/or illegal surety bonds through Upper Hudson and to exploit Upper Hudson's goodwill and insurance licenses through AMS Surety's network of insurance brokers and agents, including Barnhardt.

59.     At the time that the Stock Purchase Agreement was executed on June 12, 2007, Miller knew that the transaction contemplated by the Stock Purchase Agreement likely would not be consummated because the New York State Insurance Department would not approve the transaction given Miller's past and history in the insurance industry. Such conduct included: (1) revocation of Miller's insurance license in 2004 by the State of Maryland as a result of Miller's scheme to defraud African-American owned funeral businesses; (2) the entry of judgments against him in civil lawsuits; and (3) Miller's filing for bankruptcy in an attempt to have a civil judgment based on fraud discharged.

60.     Despite this certain knowledge that the New York State Insurance Department never would approve the transfer of control of Upper Hudson to Miller or any entity controlled by him, Miller caused AMS Capital to enter into the Stock Purchase Agreement for the purpose of enabling Miller to use his position as Chief Underwriting Officer of Upper Hudson to exploit Upper Hudson's name, licenses and goodwill for his financial benefit, the benefit of AMS Surety and the AMS Enterprise in the offering and sale of surety bonds.

***Predicate Acts***

61.     From June 12, 2007, through January 28, 2008, employees of AMS Surety, including Miller and Kahler, sent and/or caused to be sent to Upper Hudson by private or commercial interstate carrier checks for payment of premiums on surety bonds issued by Upper Hudson, which AMS Surety collected.  These deliveries by interstate carrier were sent from AMS Surety's offices in Columbia, Maryland, to Upper Hudson's offices in Monticello, New York.  Specifically, each of the following payments was sent by AMS Surety to Upper Hudson, on or about the date indicated, by private or commercial interstate carrier:

| Date | Description of What Was Sent | Method of Delivery |
|---|---|---|
| 9/6/2007 | Check dated 9/6/2007 in the amount of $16,875.00 payable to Upper Hudson from AMS Surety Holdings Corporation's bank account representing bond premiums relating to a performance and payment bond issued to CPD Plastering, Inc. | Federal Express |
| 9/6/2007 | Check dated 9/6/2007 in the amount of $9,348.52 payable to Upper Hudson from AMS Surety Holdings Corporation's bank account representing bond premiums relating to a performance and payment bond issued to CPD Plastering, Inc. | Federal Express |
| 9/18/2007 | Check dated 9/13/2007 in the amount of $20,259.00 payable to Upper Hudson from Huff Grading & Pipeline Company, Inc.'s bank account representing bond premiums relating to a performance and payment bond issued to Huff Grading & Pipeline Company, Inc. | Federal Express |

| Date | Description of What Was Sent | Method of Delivery |
|---|---|---|
| 9/18/2007 | Check dated 9/18/2007 in the amount of $262,990.49 payable to Upper Hudson from AMS Surety Holdings Corporation's bank account representing premiums relating to the Helmark Bond. | Federal Express |
| 10/8/2007 | Check dated 10/3/2007 in the amount of $3,870.75 payable to Upper Hudson from Haskell Site Work, LLC's bank account representing premiums relating to a performance and payment bond issued to Haskell Site Work, LLC. | Federal Express |
| 10/24/2007 | Check dated 10/22/2007 in the amount of $5,856.98 payable to Upper Hudson from Haskell Site Work, LLC's bank account representing premiums relating to a performance and payment bond issued to Haskell Site Work, LLC. | Federal Express |
| 11/6/2007 | Check dated 10/31/2007 in the amount of $5,455.94 payable to Upper Hudson from Haskell Site Work, LLC's bank account representing premiums relating to a performance and payment bond issued to Haskell Site Work, LLC. | Federal Express |
| 11/14/2007 | Check dated 10/5/2007 in the amount of $6,800.00 payable to Upper Hudson from Arista Builders and Designers Inc.'s bank account representing premiums relating to a performance and payment bond issued to Arista Builders and Designers Inc. | Federal Express |
| 11/14/2007 | Check dated 11/7/2007 in the amount of $29,400.00 payable to Upper Hudson from First Surety Financial LLC's bank account representing premiums relating to a performance and payment bond issued to Ninsa, LLC. | Federal Express |
| 11/14/2007 | Check dated 11/21/2007 in the amount of $56,700.00 payable to Upper Hudson from Kesco Dynamics, Inc. bank account representing premiums relating to a performance and payment bond issued to Kesco Dynamics, Inc. | Federal Express |
| 1/2/2008 | Check dated 11/27/2007 in the amount of $12,460.32 payable to Upper Hudson from Concrete Artisans, LLC's bank account representing premiums relating to a performance and payment bond issued to Concrete Artisans, LLC. | Federal Express |
| 12/28/2007 | Check dated 12/28/2007 in the amount of 3,500.00 payable to Upper Hudson from Scotlandyard Security Services, Ltd. representing premiums relating to a performance and payment bond issued to Scotlandyard Security Services, Ltd. | Federal Express |
| 12/28/2007 | Check dated 12/28/2007 in the amount of $6,515.07 payable to Upper Hudson from AMS Surety Holdings Corporation's bank account representing premiums for bond to discharge lien issued to CBI General Contracting. | Federal Express |
| 1/14/2008 | Check dated 1/11/2008 in the amount of $10,200.00 payable to Upper Hudson from Universal Concrete Products Corp.'s bank account representing premiums relating to a performance and payment bond issued to Universal Concrete Products Corp. | Federal Express |

| Date | Description of<br>What Was Sent | Method<br>of Delivery |
|---|---|---|
| 1/23/2008 | Check dated 1/11/2008 in the amount of $10,543.95 payable to Upper Hudson from G & M Plumbing's bank account representing premiums relating to a performance and payment bond issued to G & M Plumbing. | Federal Express |
| 1/16/2008 | Check dated 1/11/2008 in the amount of $71,147.61 payable to Upper Hudson from Irwin & Leighton, Inc.'s bank account representing premiums relating to a performance and payment bond issued to Irwin & Leighton, Inc. | Federal Express |
| 1/22/2008 | Check dated 1/18/2008 in the amount of $3,930.66 payable to Upper Hudson from Haskell Site Work, LLC's bank account representing premiums relating to a performance and payment bond issued to Haskell Site Work LLC. | Federal Express |
| 1/24/2008 | Check dated 1/21/2008 in the amount of $70,620.00 payable to Upper Hudson from First Surety Financial LLC's bank account representing premiums relating to a performance and payment bond issued to Tekton Development Corp. | Federal Express |
| 1/30/2008 | Check dated 1/28/2008 in the amount of $42,870.00 payable to Upper Hudson from First Surety Financial LLC's bank account representing premiums relating to a performance and payment bond issued to Tekton Development Corp. | Federal Express |

62.     On September 11, 2007, Kahler sent Kim Baade (underwriting assistant for Upper Hudson) and Donald Appel (Upper Hudson's Chief Financial Officer) by electronic mail a routing sheet relating to a bond issued by Upper Hudson, through AMS Surety, for Huff Grading.

63.     On December 19, 2007, January 3, 2008, January 4, 2008 and January 11, 2008, Kahler sent to Baade and/or Wong electronic mails requesting that Wong, on behalf of Upper Hudson, execute the attached paperwork relating to bonds to be issued by Upper Hudson through AMS Surety.

64.     On January 15, 2008, Kahler sent Baade by electronic mail the bond files relating to surety bonds issued by Upper Hudson through Miller and/or AMS.  Kahler sent these bond files in 40 separate e-mails, each of which contained the bond files or portions of the bond files.

27

65.     The sending and delivery of the information, files and payments were integral to the AMS Enterprise and Miller's scheme to defraud Upper Hudson and Upper Hudson Holdings by trading off of Upper Hudson's goodwill and licenses.   When entering into the Stock Purchase Agreement, Miller and AMS Surety well knew that the sale contemplated by that agreement never would be consummated because the required approval of the New York State Insurance Department never would be obtained as a result of Miller's past conduct, including but not limited to the revocation of Miller's insurance license by the State of Maryland.   Nevertheless, in causing AMS Capital to enter into the Stock Purchase Agreement, it was Miller's purpose and design to exploit and trade off of the goodwill and licenses of Upper Hudson for as long as possible, through AMS Surety and under the guise of Upper Hudson's Chief Underwriting Officer, prior to the inevitable termination of the Stock Purchase Agreement.   The foregoing deliveries and emails, as alleged in paragraphs 61-64, by which bond documentation, underwriting files and premium payments were forwarded by AMS Surety to Upper Hudson for the purpose of reinforcing Upper Hudson's belief that Miller and AMS Surety were performing in accordance with the Employment Agreement and the parties' interim understanding (pending closing of the transaction), were designed and intended to lull Upper Hudson and its officers and agents into a false sense of security that Miller and AMS Surety were performing in accordance with the Employment Agreement and their interim understanding and the Stock Purchase Agreement, and to conceal their unlawful and unauthorized acts.   Such unlawful and unauthorized acts included, *inter alia*, AMS Surety's acting as a co-surety on bonds issued by Upper Hudson (even though AMS Surety was not a licensed insurance company), the issuance of performance and payment bonds by Miller and AMS Surety in the name of *bona fide* insurance companies on whose behalf neither Miller nor AMS Surety was authorized to act, and the

issuance of bonds in excess of Upper Hudson's authorized limits. The delivery of the bond documentation, bond files and premium payments by AMS Surety to Upper Hudson provided an aura of legitimacy and regularity to Miller's and AMS Surety's conduct, and made the termination of the Stock Purchase Agreement, the termination of Miller's Employment Agreement and the discovery of the unlawful conduct of Miller and AMS Surety less likely than if the delivery of the files and premium payments had not occurred. The effect of these deliveries was to lull Upper Hudson into leaving Miller in place as Upper Hudson's Chief Underwriting Officer, continuing to vest in him the authority to review and underwrite applications for Upper Hudson surety bonds, rather than terminating such authority, and these e-mails and commercial interstate carrier deliveries were therefore part of Miller's and AMS Surety's ongoing scheme to defraud. Upper Hudson's reliance on these bond documents, bond files and premium payments resulted in the delay of Upper Hudson launching any earlier investigation into the improper use of Upper Hudson's licenses and goodwill, as a result of which Upper Hudson has been damaged as alleged further herein.

66.     Each of the specific acts of interstate emailing alleged in paragraphs 62-64 above, which were made in furtherance of the scheme to defraud, constitutes an act of wire fraud proscribed by 18 U.S.C. § 1343. Each of the interstate deliveries alleged in paragraph 61 above, which were caused to be made in furtherance of the scheme to defraud, constitutes an act of mail fraud proscribed by 18 U.S.C. § 1341. Together, these acts comprise a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5).

67.     The sending and/or delivery of these bond documents, files and payments were integral to the scheme to defraud, which was designed and intended to trade off of and exploit

Upper Hudson's goodwill and licenses, and to provide the appearance of legitimacy to Miller, AMS Surety and the AMS Enterprise.

**COUNT I**
**Substantive Racketeering – 18 U.S.C. §§ 1962(c) and 1964 – Against Miller, Tardif, Kahler, Sullivan, Wakefield and Barnhardt**

68.     Upper Hudson restates and incorporates by reference the allegations of paragraphs 1 through 67 of the Complaint as though fully set forth herein.

69.     At all relevant times, Miller, Tardif, Kahler, Sullivan, Wakefield and Barnhardt were "persons" as that term is defined in 18 U.S.C. § 1961(3).

70.     The AMS Enterprise constitutes an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the AMS Enterprise are and have been associated through time, joined in the purpose and organized in a manner amenable to hierarchal and consensual decision-making, with each member fulfilling a specific and necessary role to carry out and facilitate the AMS Enterprise's purpose.   Miller used AMS Capital to enter into the Stock Purchase Agreement with Upper Hudson Holdings.   Miller used AMS Surety in executing his responsibilities as the Chief Underwriting Officer of Upper Hudson to carry out a scheme to defraud Upper Hudson and Upper Hudson Holdings by using Upper Hudson to issue and/or to cause to be issued unauthorized and/or unlawful surety bonds.   Tardif, Kahler, Sullivan, Wakefield and Barnhardt, all of whom were employees, consultants or brokers of AMS Surety or M&M, knowingly assisted Miller and AMS Surety in carrying out the scheme to defraud.  Miller and Kahler underwrote, prepared and issued improper and fraudulent bonds; Tardif, a former insurance regulator, oversaw the operations of AMS Surety, which the New York State Insurance Department deemed to be an illegal insurance operation; Sullivan and Wakefield oversaw and managed all accounting and bookkeeping related to AMS Surety's illegal insurance

30

operation; Barnhardt, through M&M, worked with Miller in marketing, selling and issuing unlawful surety bonds and the collection of premiums on such bonds; and Barnhardt tried to convince Upper Hudson and its employees that AMS Surety was a legitimate company, and that it would be in Upper Hudson's best interests to work with Miller and AMS Surety.  From June 12, 2007, through the date of commencement of this action, each defendant named in this Count took affirmative steps to hide their fraud from Upper Hudson, Upper Hudson Holdings and others, including various state regulators, the purchasers of improper, fraudulent and/or illegal surety bonds and the obligees of such bonds.  The planning and carrying out of the scheme would have been beyond the capacity of each member of the AMS Enterprise acting singly and without the aid of the other defendants.

71.     Each defendant named in this Count is or has been employed by and/or associated with the AMS Enterprise.  Each defendant named in this Count began implementing the fraud and scheme in or about March, 2007, or at some unknown date prior thereto, and they continued to execute the fraud and scheme through the date of the commencement of this action.

72.     On information and belief, each of the defendants named in this Count received a financial benefit for his or her participation in the scheme.  Such financial benefits were the product of the scheme and could not have been realized had each of the defendants named in this Count not joined the AMS Enterprise and carried out the scheme and fraud.

73.     Miller, Kahler and other employees of AMS Surety caused to be delivered by interstate carrier to Upper Hudson checks in furtherance of the scheme and fraud.  Kahler sent bond files to Upper Hudson using electronic means in furtherance of the scheme and fraud. Kahler, Sullivan and Wakefield sent invoice requests and accounting records and data using

electronic means in furtherance of the scheme and fraud. They also caused checks to be issued from AMS Surety to Upper Hudson.

74.     Each of the defendants named in this Count conducted and/or participated in the conduct of the AMS Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), by engaging in numerous acts of mail fraud and/or wire fraud.

75.     Upper Hudson has suffered a loss to its business and property as a result of the scheme and fraud, as follows:  (1) diminution in its market value, resulting from the regulatory and other business impediments arising from Miller's and AMS Surety's conduct, and the resulting cloud on Upper Hudson's goodwill, of at least $5,000,000.00; (2) expenses incurred in connection with the New York State Insurance Department's investigation of Upper Hudson, including the Endurance Bond and the Helmark Bond; (3) expenses incurred in connection with addressing and resolving disputes and regulatory issues arising from the improper and/or illegal surety bonds issued by Miller on behalf of Upper Hudson; and (4) operational expenses incurred in connection with the underwriting and issuance of bonds by Miller for Upper Hudson.

WHEREFORE, Plaintiff, Upper Hudson National Insurance Company, respectfully prays for entry of judgment in its favor and against Defendants William R. Miller, II, Robert Tardif, Nadia Kahler, Daniel Sullivan, Bryan Wakefield, and Tim Barnhardt, and for relief as follows, awarding:

A.     Treble damages, pursuant to 18 U.S.C. § 1964(c), in the amount of at least $15,000,000.00, or such amount as shall be proved at trial;

B.     Injunctive and other equitable relief, including an accounting of surety bonds caused to be issued under the name of Upper Hudson;

C.     Reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c); and

D.     Such other and further relief as this Court may deem just and proper.

**COUNT II**
**Racketeering Conspiracy – 18 U.S.C. §§ 1962(d) and 1964 – Against Miller, Tardif, Kahler,**
**Sullivan, Wakefield and Barnhardt**

76.    Upper Hudson restates and incorporates by reference the allegations of paragraphs 1 through 75 of the Complaint as though fully set forth herein.

77.    At all relevant times, Miller, Tardif, Kahler, Sullivan, Wakefield and Barnhardt were "persons" as that term is defined in 18 U.S.C. § 1961(3).

78.    The AMS Enterprise is an "enterprise" within the meaning of 18 U.S.C. §1961(4).

79.    Miller, Tardif, Kahler, Sullivan, Wakefield and Barnhardt have wilfully combined, conspired and agreed to violate 18 U.S.C. § 1962(c), that is to conduct and/or participate, directly or indirectly, in the conduct of AMS Enterprise's affairs through a pattern of racketeering activity based upon numerous acts of mail fraud and wire fraud in violation of 18 U.S.C. § 1962(d).

80.    It was a further part of the conspiracy to implement and carry out the scheme to defraud and exploit Upper Hudson, so that defendants would enrich themselves through the operation of the AMS Enterprise by, among other means, generating sales of surety bonds and revenue which would not have been realized in the absence of the enterprise.  These revenues were to be and were in fact distributed to defendants in the form of profits, salaries, bonuses and commission payments.

81.    Miller, Tardif, Kahler, Sullivan, Wakefield and Barnhardt embraced the object of the conspiracy and knowingly acted to support and facilitate the accomplishment of its goals. The conspiracy and fraudulent scheme began as early as March, 2007 and continues through the present.

82.    Upper Hudson has suffered a loss to its business and property as a result of the conspiracy, scheme and fraud, as follows: (1) diminution in its market value, resulting from the

regulatory and other business impediments arising from Miller's and AMS Surety's conduct, and

the resulting cloud on Upper Hudson's goodwill, of at least $5,000,000.00; (2) expenses incurred

in connection with the New York State Insurance Department's investigation of Upper Hudson,

including the Endurance Bond and the Helmark Bond; (3) expenses incurred in connection with

addressing and resolving disputes and regulatory issues arising from the improper and/or illegal

surety bonds issued by Miller on behalf of Upper Hudson; and (4) operational expenses incurred

in connection with the underwriting and issuance of bonds by Miller for Upper Hudson.

WHEREFORE, Plaintiff, Upper Hudson National Insurance Company, respectfully prays

for entry of judgment in its favor and against Defendants William R. Miller, II, Robert Tardif,

Nadia Kahler, Daniel Sullivan, Bryan Wakefield and Tim Barnhardt, and for relief as follows,

awarding:

A.   Treble damages, pursuant to 18 U.S.C. § 1964(c), in the amount of at least $15,000,000.00, or such amount as shall be proved at trial;

B.   Injunctive and other equitable relief, including an accounting of surety bonds caused to be issued under the name of Upper Hudson;

C.   Reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c); and

D.   Such other and further relief as this Court may deem just and proper.

## COUNT III
## Common Law Fraud – Against Miller, AMS Surety and AMS Capital

83.   Upper Hudson restates and incorporates by reference the allegations of paragraphs

1 through 82 of the Complaint as though fully set forth herein.

84.   To implement and carry out his scheme to defraud, Miller made certain material

misrepresentations to Upper Hudson, as alleged hereinabove.  Specifically, Miller, individually

and on behalf of AMS Surety and AMS Capital, knowingly and/or with reckless disregard made

the following material misrepresentations to Upper Hudson:  (1) that AMS Surety did not need

insurance licenses to issue surety bonds because it was exempt under the federal Miller Act; (2) that AMS Surety had the legal authority to conduct and carry out all of its business and activities; and (3) that AMS Surety had all of the requisite governmental licenses and permits to conduct and carry out AMS Surety's business. Based upon these misrepresentations, Upper Hudson entered into the Employment Agreement with Miller and Upper Hudson allowed Miller and AMS Surety to perform the underwriting on prospective surety bonds to be issued by Upper Hudson.

85.     Additionally, prior to the issuance of the Helmark Bond, Miller knowingly and/or with reckless disregard misrepresented to Kaniewski that the Helmark Bond could be issued in excess of Upper Hudson's statutory limit because Pennsylvania law permitted Upper Hudson to issue such a surety bond, any statutory limit notwithstanding. Based upon this misrepresentation, Kaniewski executed the power of attorney, on behalf of Upper Hudson, for the issuance of the Helmark Bond.

86.     Upper Hudson reasonably relied on the foregoing misrepresentations to its detriment.

87.     Upper Hudson has suffered a loss to its business and property as a result of the foregoing misrepresentations, as follows: (1) diminution in its market value, resulting from the regulatory and other business impediments arising from Miller's and AMS Surety's conduct, and the resulting cloud on Upper Hudson's goodwill, of at least $5,000,000.00; (2) expenses incurred in connection with the New York State Insurance Department's investigation of Upper Hudson, including the Endurance Bond and the Helmark Bond; (3) expenses incurred in connection with addressing and resolving disputes and regulatory issues arising from the improper and/or illegal

surety bonds issued by Miller on behalf of Upper Hudson; and (4) operational expenses incurred in connection with the underwriting and issuance of bonds by Miller for Upper Hudson.

WHEREFORE, Plaintiff, Upper Hudson National Insurance Company, respectfully prays for entry of judgment in its favor and against Defendants William R. Miller, II, AMS Surety Holdings Corp. and AMS Capital Holdings Corp., and for relief as follows, awarding:

A.   Actual damages in the amount of at least $5,000,000.00, or such amount as shall be proved at trial;

B.   Punitive damages in the amount of at least $10,000,000.00; and

C.   Such other and further relief as this Court may deem just and proper.

### COUNT IV
### Common Law Civil Conspiracy – Against All Defendants

88.   Upper Hudson restates and incorporates by reference the allegations of paragraphs 1 through 87 of the Complaint as though fully set forth herein.

89.   Miller, AMS Surety, AMS Capital, Tardif, Kahler, Sullivan, Wakefield and Barnhardt knowingly and willfully agreed, combined and conspired to conduct and/or participate, directly or indirectly, in carrying out Miller's and/or AMS Surety's scheme to defraud and exploit Upper Hudson.

90.   The object of the conspiracy was to implement and carry out the scheme to defraud and exploit Upper Hudson.

91.   Miller, AMS Surety, AMS Capital, Tardif, Kahler, Sullivan, Wakefield and Barnhardt embraced the object of the conspiracy and knowingly and willfully acted to support and facilitate the scheme to defraud and exploit Upper Hudson.

92.   Upper Hudson has suffered a loss to its business and property as a result of the conspiracy and scheme to defraud, as follows: (1) diminution in its market value, resulting from the regulatory and other business impediments arising from Miller's and AMS Surety's conduct,

and the resulting cloud on Upper Hudson's goodwill, of at least $5,000,000.00; (2) expenses incurred in connection with the New York State Insurance Department's investigation of Upper Hudson, including the Endurance Bond and the Helmark Bond; (3) expenses incurred in connection with addressing and resolving disputes and regulatory issues arising from the improper and/or illegal surety bonds issued by Miller on behalf of Upper Hudson; and (4) operational expenses incurred in connection with the underwriting and issuance of bonds by Miller for Upper Hudson.

WHEREFORE, Plaintiff, Upper Hudson National Insurance Company, respectfully prays for entry of judgment in its favor and against Defendants, William R. Miller, II, AMS Surety Holdings Corp., AMS Capital Holdings Corp., Robert Tardif, Nadia Kahler, Daniel Sullivan, Bryan Wakefield and Tim Barnhardt, and for relief as follows, awarding:

A.    Actual damages in the amount of at least $5,000,000.00, or such amount as shall be proved at trial;

B.    Punitive damages in the amount of at least $10,000,000.00; and

C.    Such other and further relief as this Court may deem just and proper.

### Jury Trial Demanded

Plaintiff demands a trial by jury.

Respectfully submitted,

UPPER HUDSON NATIONAL INSURANCE
COMPANY


_Brendan Collins_

David K. Monroe
Brendan Collins
GALLAND KHARASCH GREENBERG
FELLMAN & SWIRSKY, PC
1054 Thirty-First Street, NW
Washington, DC  20007
Telephone:     202/342-5200
Facsimile:     202/342-5219
Email:         dmonroe@gkglaw.com
               bcollins@gkglaw.com

Michael D. Sher
Athanasios Papadopoulos
Meredith D. Schacht
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 2200
Chicago, IL  60602-3801
Telephone:     312/269-8000
Facsimile:     312/269-1747
Email:         msher@ngelaw.com
               tpapadopoulos@ngelaw.com
               mschacht@ngelaw.com

Counsel for Plaintiff
UPPER HUDSON NATIONAL
INSURANCE COMPANY

DATE:   February 19, 2008